293 P.3d 137

**Robert E. KEOWN, Plaintiff–Appellant,**

v.

**TUDOR INSURANCE COMPANY, a
New Hampshire Corporation,
Defendant–Appellee.**

No. 29695.

Intermediate Court of Appeals of Hawai'i.

Dec. 13, 2012.

Evan R. Shirley and Michel A. Okazaki, on the briefs, for Plaintiff–Appellant.

John H. Price, Amanda J. Weston and James L. Wraith (Selvin Wraith Halman, LLP), on the briefs, for Defendant–Appellee.

FOLEY, Presiding Judge, FUJISE and LEONARD, JJ.

Opinion of the Court by FUJISE, J.

## ORDER GRANTING TUDOR INSURANCE COMPANY'S MOTION FOR PUBLICATION OF OPINION

Upon consideration of "Tudor Insurance Company's Motion for Publication of Opinion" (Motion) filed on September 11, 2012, and no opposition being filed,

IT IS HEREBY ORDERED that the Motion is granted.

IT IS FURTHER ORDERED that (1) the Summary Disposition Order of this court filed on August 16, 2012 is withdrawn and vacated; and (2) Minute Order No. 12–44, filed on July 20, 2012, is continued in effect. A new opinion will be issued shortly.

Plaintiff–Appellant Robert E. Keown (Keown) appeals from the judgment entered February 10, 2009, in the Circuit Court for the Fifth Circuit (circuit court)[1] granting summary judgment in favor of Defendant–Appellee Tudor Insurance Company (Tudor).

## I.

At all times relevant to this appeal, Keown was a real estate agent and owner of a real estate brokerage firm (Bob Keown Ltd., d/b/a Makai Properties) that he began in or around 1980 and sold on May 18, 2005. Keown maintained a professional liability insurance policy (policy) with Tudor from December 15, 2003 through February 15, 2005. Keown was one of several unpaid directors of the Koloa Early School (the School), a non-profit entity in Kaua'i. The School operated on land it subleased from Honpa Hongwanji Mission of Hawai'i (Honpa), a non-profit entity that operated a Buddhist temple and supervised the Koloa Hongwanji Mission (Koloa), an affiliated temple which occupied the land and buildings on the property leased by Honpa.

In 2003, an opportunity to purchase the leased property occupied by the School and Koloa (the property) arose and the School agreed to jointly purchase the property with Honpa and later subdivide it with Honpa. Honpa, rather than Koloa, was to be the named co-purchaser alongside the School. As Keown described his role in the transaction he "handled many of the details" on behalf of both the School and Honpa, including arranging for an appraisal and a survey of the property, researching land division options, working with county officials, preparing and submitting the Deposit Receipt Offer and Acceptance (DROA) to the sellers, listing his real estate company as broker, and being "the 'person on point' concerning the property acquisition."

Keown prepared the draft DROA, which Honpa and the School executed as joint purchasers in April 2003, without having an agreement in place as to how the property would be divided. Despite the inability to reach agreement on co-tenancy structure and division of the property, Honpa and the School agreed to close the sale. The deed conveyed an undivided one-half interest to the School and an undivided one-half interest to Honpa. Unbeknownst to Honpa or Koloa, Keown also recorded a mortgage for himself as mortgagee of an undivided one-half interest in the property to secure a $230,000 loan he made to the School to finance its purchase of the school building and the land under it. Following closing and recordation of the deed, efforts to reach an agreement on division of the property remained unsuccessful.

In January 2005, approximately one year after closing, Honpa filed a complaint against the School and Keown seeking partition of the property and making a claim against Keown for negligence.

Honpa alleged that (1) the School had agreed that the School would only obtain that portion of the property underlying the school building and that Honpa would acquire the rest of the property; (2) Keown, acting as "Principal Broker/Broker–in–Charge" represented both Honpa and the School and drafted the DROA for the property but told both buyers that the DROA was "simply a formal-

[1]. The Honorable Kathleen N.A. Watanabe presided.

ity" and the details of the division and ownership of the property would be documented later; (3) as the parties did not reach an agreement as to the property division, the Warranty Deed recording the purchase stated that the 50% undivided interests specified therein would not bind either party; (4) Keown recorded a mortgage "which identifies Keown is [sic] a mortgagee of an undivided one-half (½) interest" in the property without disclosing this to Honpa; and (5) Keown breached his duty of care to Honpa causing damage to Honpa by, among other things, causing it to be in dispute with the School over the ownership of the property.

In addition to a partition of the property, the complaint sought monetary damages and attorneys' fees and costs.

In February 2005, Keown tendered the complaint to Tudor through his attorney. Tudor responded with a rejection letter, denying coverage based on exclusions contained in the policy. Tudor specifically relied on the following clauses in the policy's enumerated exclusions and provisions of the Real Estate Agents and Brokers Endorsement:

## III. Exclusions

Coverage provided in this policy does not apply to any loss[2] in connection with or arising out of or in any way involving:

. . . .

G.  Actions against the Insured arising out of or connected with the performance or failure to perform services for any person or entity:
1.  which is owned by, controlled by or in which any Insured has any financial interest;
2.  which owns, controls, or has any financial interest in any Insured covered by this policy;
3.  which is affiliated with any Insured through any common ownership, control, or financial interest; or
4.  in which any Insured is a director, officer, partner, manager, or principal stockholder.

. . . .

N.  The Insured's Services and/or capacity as:

---

1.  a partner, principal, officer, director, employee or trustee of a business enterprise not named in the declarations;

. . . .

## REAL ESTATE AGENTS AND BROKERS ENDORSEMENT

. . . .

B.  This policy does not apply to:

. . . .

2.  Any claim arising out of or connected with any transaction in which the Insured has a direct or indirect beneficial ownership interest as a buyer or seller of real property; however, this exclusion does not apply to real property to which the Insured has taken legal title solely for immediate resale and has entered into a written contract to sell not later than ninety (90) days after taking legal title.

Keown hired counsel to defend the lawsuit brought by Honpa, which was eventually settled with all claims against Keown dismissed with prejudice and Honpa agreeing to pay a portion of Keown's litigation costs. In December 2007, after settling with Honpa, Keown filed the instant complaint for declaratory relief against Tudor. His complaint alleged that Tudor was obligated under the policy to defend and indemnify Keown with respect to the claims Honpa had asserted against him. The declaratory judgment action was resolved on cross-motions for summary judgment, with the circuit court entering an order in favor of Tudor on January 6, 2009. In relevant part, the circuit court stated:

The court finds as a matter of law based on the undisputed facts that the scope of the exclusionary clause in Tudor's insurance policy is broad in scope and that it encompasses the underlying lawsuit by [Honpa] against [Keown].

The court further finds as a matter of law that based on the undisputed facts alleged in the underlying complaint that [Keown's] capacities as a director of [the School] and as a professional realtor in the transaction which is the subject of the underlying lawsuit are inextricably inter-

---

2.  The policy defines "loss" to include "claim expenses," meaning costs, charges, fees, and ex-

penses incurred in defending an insured against any claim or litigation.

twined and that the real estate malpractice claims against [Keown] arose from his dual agency representation of [Honpa] and [the School] in the transaction on which the underlying suit was based.

On appeal, Keown raises the following points of error: The circuit court (1) did not properly apply Hawai'i law regarding the duty to defend; (2) erred in concluding that Keown's capacities as a School director and as a realtor were inextricably intertwined; (3) failed to construe the policy according to a layperson's reasonable expectations; and (4) erred in determining that Honpa's claims against Keown arose from his representation of both Honpa and the School in the transaction upon which the underlying suit was based.

Based on the plain language of the policy and the undisputed facts before it, we conclude that the circuit court did not err when it ruled Tudor did not have a duty to defend Keown in the underlying civil suit.

## II.

■ Insurers in Hawai'i have a broad duty to defend under general liability policies.

> The obligation to defend is broader than the duty to pay claims and arises wherever there is the mere *potential* for coverage. In other words, the duty to defend rests primarily on the *possibility* that coverage exists. This possibility may be remote but if it exists, the insurer owes the insured a defense. All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured.
>
> Accordingly, in connection with the issue of its duty to defend, [the insurer bears] the burden of proving that there was no genuine issue of material fact with respect to whether a *possibility* existed that [the insured] would incur liability for a claim covered by the policies. In other words, [the insurer] was required to prove that it would be *impossible* for [the claimant] to prevail against [the insured] in the underlying lawsuits on a claim covered by the policies.

*Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 412–13, 992 P.2d 93, 107–08

(2000) (citations, internal quotation marks, brackets and ellipses omitted).

■ However,

[i]nsurance policies are subject to the general rules of contract construction, the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended and the court must respect the plain terms of the policy and not create ambiguity where none exists.

*First Ins. Co. of Hawai'i v. State*, 66 Haw. 413, 423–24, 665 P.2d 648, 655 (1983) (citation, internal quotation marks, brackets, and ellipses omitted).

■ Exclusion G of the Tudor policy was very broadly worded, providing that "[a]ctions against the insured *arising out of or connected with* the performance or failure to perform services for any person or entity" that was "controlled by" or "in which any Insured is a director." It is undisputed that Honpa's lawsuit was based on the real estate transaction in which Keown, acting on behalf of both Honpa and the School, provided real estate brokerage services in researching, participating in negotiation meetings, arranging for an appraisal, and preparing the DROA. It is also undisputed that Keown was a director on the School's board and was the point person in shepherding the transaction. Given the extensive nature of Keown's participation in this real estate transaction in which he acted, at least in part, on behalf of the entity for whom he also served as a board director, there can be no question that the subsequent lawsuit brought by Honpa was an action connected with or arising out of services Keown performed for an entity which he helped control and was a director.

Conversely, nothing in the record indicates that Keown's activities as a real estate broker and agent for the co-purchasers were either separate or distinct from his directorial services for the School. That Keown received no compensation for his services and donated costs further indicates that he was acting as an interested director in the transaction and not merely as a real estate broker working for his business. Under these circumstances, the circuit court was correct in

determining that Keown's actions constituted the "performance [of] ... services for any ... entity ... in which any Insured is a director[.]" Because Keown's actions fell clearly within the Tudor policy's exclusions and there was no possibility that coverage existed, Tudor had no duty to defend Keown against the underlying claim.

■ In addition to his role as a School director, Keown also had a financial interest in the subject property as a mortgagee. The underlying claim thus fell under a separate clause in Keown's policy that excludes "[a]ctions against the Insured arising out of or connected with the performance or failure to perform services for any person or entity ... which is affiliated with any Insured through any common ownership, control or financial interest[.]" By securing his loan to the School with a mortgage on the School's undivided interest in the subject property, Keown obtained a common financial interest in the property of the Early School. *See Owens v. Owens,* 104 Hawai'i 292, 295–96, 88 P.3d 664, 667–68 (App.2004) (noting that a lender had a security interest in mortgagors' property by virtue of its promissory note and their signatures on the mortgage). This financial interest was closely connected to the underlying action against Keown, as Honpa's complaint was based in part on Keown's failure to disclose his mortgage and promissory note and prayed that this mortgage be removed from Honpa's interest in the property.

As to Keown's point on appeal that giving effect to the policy's exclusionary clauses is contrary to the reasonable expectations of a layperson in Keown's position, we disagree. The policy's exclusions, while numerous, were neither unclear nor unexpected. Exclusion G.4., denying coverage for services performed for an entity "in which any Insured is a director," is a type of common clause oftentimes referred to as a "business enterprise" exclusion.[3] In sum, that Keown's professional

insurance would not cover his personal business activities was neither unknowable nor unexpected under the circumstances of this case.

### III.

Based on the foregoing, the Judgment entered on February 10, 2009, in the Circuit Court for the Fifth Circuit is affirmed.

---

3. We note that the "business enterprise" exclusion has two purposes: (1) to prevent collusive suits in which liability coverage for negligence arising from business activities could be used to shift the insured's non-insured business losses onto the insurer; and (2) to prevent coverage in circumstances where an insured so substantially intermingles non-insured business actions with professional services that the insurer carries the additional risk of having to cover an insured for

claims relating to the personal business conduct rather than solely from professional services. *See Jeffer v. Nat'l Union Fire Ins. Co.,* 306 N.J.Super. 82, 703 A.2d 316, 322 (N.J.Super.Ct.App.Div.1997) (citing *Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.,* 821 F.2d 216, 221 (3d Cir.1987)). The exclusion of coverage for Honpa's claim against Keown furthers both of these purposes.